IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MICHAEL PURNELL, on behalf )
of NANCY L. PURNELL (deceased), )    Civil No. 1:12-cv-00056-JE
)
            Plaintiff, )
)    OPINION AND ORDER
        v. )
)
MICHAEL J. ASTRUE, )
Commissioner of Social Security, )
)
            Defendant. )
_____)

    Arthur Wilber Stevens , III
    Black Chapman Webber & Stevens
    221 Stewart Avenue, Suite 209
    Medford, OR 9750

        Attorney for Plaintiff


    S. Amanda Marshall, U.S. Attorney
    Adrian L. Brown, Asst. U.S. Attorney
    1000 S.W. 3rd Avenue, Suite 600
    Portland, OR 97204-2902

Kathryn Ann Miller
Social Security Administration
Office of the General Counsel
701 Fifth Avenue, Suite 2900, M/S 901
Seattle, WA 98104

      Attorneys for Defendant

JELDERKS, Magistrate Judge:

Plaintiff Michael Purnell brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying an application for Disability Income Benefits (DIB) filed under the Social Security Act (the Act) by Nancy Purnell, who is now deceased. Plaintiff seeks an Order remanding the action to the Social Security Administration (the Agency) for an award of benefits for a period during which the Commissioner found Ms. Purnell was not disabled.

For the reasons set out below, the Commissioner's decision is reversed and the action is remanded to the Agency for an award of benefits.

## **Procedural Background**

Ms. Purnell filed an application for DIB on November 6, 2008, alleging that she had been disabled since July 21, 2008, because of a wrist injury, rheumatoid arthritis, back pain, gastro - esophageal reflux disease (GERD), and high blood pressure.

After her claim had been denied initially and on reconsideration, Ms. Purnell timely requested an administrative hearing.

On November 5, 2009, a hearing was held before Administrative Law Judge (ALJ) Michael Gilbert.

In a decision filed on December 7, 2009, ALJ Gilbert found that Ms. Purnell was not disabled within the meaning of the Act.

OPINION AND ORDER - 2

On March 24, 2010, while her request for review of the ALJ's adverse decision was pending before the Appeals Council, Ms. Purnell filed a second application for DIB. The Agency found in Ms. Purnell's favor on this second application, concluding that she had been disabled since December 8, 2009, because she met a "listing" for terminal cancer.   On February 12, 2011, the Appeals Council granted Ms. Purnell's interim request for review of the ALJ's unfavorable decision and affirmed the Agency's finding of disability on Ms. Purnell's second application.  In that decision, the Appeals Council considered the record that had been before the ALJ and the evidence subsequently submitted in support of Ms. Purnell's second application. The Appeals Council noted that the ALJ had relied on a statement obtained from the Vocational Expert (VE) after the hearing clarifying the requirements of Ms. Purnell's past relevant work as a Reader.  Though that evidence had been entered as an exhibit in the Administrative Record, it had not been provided to Ms. Purnell as was required by Agency procedures.  The Appeals Council directed that, on remand, the ALJ provide the additional evidence to Ms. Purnell, and required that, in the decision following remand, the ALJ consider and respond to any comments she offered concerning that additional evidence.

Ms. Purnell died on February 17, 2011.

On February 24, 2011, the ALJ provided Ms. Purnell's counsel the additional evidence from the VE to which the Appeals Council referred.  Counsel did not offer any additional comments in response.

On March 4, 2011, Ms. Purnell's counsel notified the ALJ that the current plaintiff, Ms. Purnell's son, Michael Purnell, would be substituted for Ms. Purnell as a party.  That substitution was completed on May 3, 2011.

OPINION AND ORDER - 3

In his decision on remand, filed on April 16, 2011, ALJ Gilbert again found that Ms. Purnell had not been disabled before December 8, 2009. That decision, which was virtually identical to the ALJ's first decision, became the final decision of the Commissioner on November 16, 2011, when the Appeals Council denied Plaintiff's timely request for review. In the present action, Plaintiff challenges that decision.

## Background

Ms. Purnell was born on June 6, 1949, and was 59 years old at the date of her alleged onset of disability. She graduated from high school and had past relevant work experience as an office clerk, a customer service worker, and a reader.

## Disability Analysis

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 C.F.R. §§ 404.1520, 416.920. Below is a summary of the five steps, which also are described in Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

Step One. The Commissioner determines whether the claimant is engaged in substantial gainful activity (SGA). A claimant engaged in such activity is not disabled. If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under Step Two. 20 C.F.R. § 404.1520(b).

Step Two. The Commissioner determines whether the claimant has one or more severe impairments. A claimant who does not have such an impairment is not disabled. If the claimant has a severe impairment, the Commissioner proceeds to evaluate the claimant's case under Step Three. 20 C.F.R. § 404.1520(c).

OPINION AND ORDER - 4

Step Three.  Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the presumptively disabling impairments listed in the Social Security Administration (SSA) regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1.  A claimant who has such an impairment is disabled.  If the claimant's impairment does not meet or equal an impairment listed in the regulations, the Commissioner's evaluation of the claimant's case proceeds under Step Four. 20 C.F.R. § 404.1520(d).

Step Four.  The Commissioner determines whether the  claimant is able to perform relevant work he or she has done in the past.  A claimant who can perform past relevant work is not disabled.  If the claimant demonstrates he or she cannot do work performed in the past, the Commissioner's evaluation of the claimant's case proceeds under Step Five.  20 C.F.R. § 404.1520(e).

Step Five.  The Commissioner determines whether the claimant is able to do any other work.  A claimant who cannot perform other work is disabled.  If the Commissioner finds that the claimant is able to do other work, the Commissioner must show that a significant number of jobs exist in the national economy that the claimant can do.  The Commissioner may satisfy this burden through the testimony of a vocational expert (VE) or by reference to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2.  If the Commissioner demonstrates that a significant number of jobs exist in the national economy that the claimant can do, the claimant is not disabled.  If the Commissioner does not meet this burden, the claimant is disabled.  20 C.F.R. § 404.1520(f)(1).

At Steps One through Four, the burden of proof is on the claimant. Tackett, 180 F.3d at 1098. At Step Five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy. Id.

## Medical Record

Dr. Michael Troychak, a radiologist, summarized the findings of an MRI taken of Ms. Purnell's right wrist on April 30, 2008, as follows:

> Extensive bony erosions typical of the inflammatory arthritis have increased considerably, now involving most of the volume of the scaphoid, much of the lunate, but all of the carpal bones show at least a mild degree of erosions that has increased . . . . There is a large effusion of the distal radial ulnar joint that is considerably increased. Smaller radiocarpal and mid-carpal effusion have increased. Moderate tenosynovitis of the extensor carpi ulnaris tendon has not changed significantly. Milder tenosynovitis of most of the other extensor tendons has developed.

Dr. Troychak summarized his impressions as follows:

> 1. Moderately severe multifocal inflammatory arthritis considerably increased, most likely rheumatoid arthritis; 2. Large rheumatoid nodule rising from a large volvar scaphoid erosion and corresponding to the palpable lump; 3. Large distal radial ulnar joint effusion considerably increased with smaller effusions in the midcarpal joints, as well as increased mild multifocal tenosynovitis; 4 Partial tear of the triangular fibrocartilage again evident.

## Dr. Chamberland

On November 14, 2008, Ms. Purnell told Dr. David Chamberland, her treating rheumatologist, that she had stopped taking prednisone about six weeks earlier, on her own. Dr. Chamberland noted that he had "[t]old patient if manipulating medications to call me." He suggested that MTX be held at its then-current dose, and discussed adding another DMARD such as Enrel or Remicade. Dr. Chamberland indicated that Ms. Purnell said that she wanted to "hold for now." Dr. Chamberland and Ms. Purnell discussed Remicade infusions, which could be given "every eight weeks as tolerated," and Dr. Chamberland warned about the side effects.

Dr. Chamberland noted that walking was "still very difficult" for Ms. Purnell and that her back pain was "still significant." He indicated that x-rays of Ms. Purnell's hands and feet were "without changes vs. 2007." He also indicated that she had been taking Prilosec for acid reflux for several years.

In notes of a visit on February 9, 2009, Dr. Chamberland indicated that Ms. Purnell was still off prednisone, but was taking "MTX 25 mg po q week" and folic acid daily. Ms. Purnell reported that her joint pain had worsened since her last appointment, and that she experienced severe stiffness in the morning and was not able to grasp well. Dr. Chamberland indicated that Ms. Purnell reported "left 2nd PIP with pain, with activity and rest," and noted that she was "not able to fully flex left 2nd digit." He noted that she reported "difficulty dressing self, brush hair, turn doorknobs, still trouble with opening jars but improved." Ms. Purnell continued to follow Dr. Chamberland's recommendation to take MTX at the current dose, and was to start receiving Remicade infusions.

In his notes of a visit on May 22, 2009, Dr. Chamberland indicated that Ms. Purnell had rheumatoid arthritis "based on an MRI right wrist 2007 with erosions, ESR elevated, CCP Ab 73 [and] inflammatory joint signs . . . ." Ms. Purnell reported that she suffered morning stiffness for up to 30 minutes, that joint pain continued to limit her activities, and that her back pain was "still significant." Dr. Chamberland noted decreased range of motion in Ms. Purnell's right wrist, bilateral nodules in her Achilles tendons, particularly on the left, and positive MTP squeeze bilaterally. An MRI of the right wrist showed bone marrow edema, small joint effusion, and a few tiny scattered erosions suggestive of inflammatory arthritis. Dr. Chamberland noted lumbar spine MRI findings showing desiccation of the L4-5 and L5-S1 disc and facet degeneration at L4-5 allowing displacement. He indicated that these were consistent with low back pain. Ms.

Purnell declined "IV or SC injectable meds," received Remicade infusions, and was warned of side effects.  Dr. Chamberland warned her that "poorly controlled RA can cause irreversible joint damage."

In notes of a visit on August 3, 2009, Dr. Chamberland indicated that Ms. Purnell's joint pain was still significant and continued to limit her activities.  Ms. Purnell reported that she had "morning stiffness lasting most of the day," and that she continued to experience significant back pain.  Ms. Purnell again received Remicade infusions.  Dr. Chamberland indicated that Ms. Purnell had difficulty dressing herself, brushing her hair, and turning doorknobs, and that her difficulty opening jars persisted, but had improved.

**Dr. Robertson**

Donald Robertson, D.O., Ms. Purnell's primary care physician, referred Ms. Purnell to Dr. Chamberland for treatment of her rheumatoid arthritis and received copies of Dr. Chamberland's treatment records.

On July 21, 2008, Ms. Purnell saw Dr. Robertson  for ongoing low back pain, which she reported had worsened over the previous three days.  Ms. Purnell told Dr. Robertson that this had "happened before," and was related to housework and chores.  Dr. Robertson noted Ms. Purnell's history of rheumatoid arthritis with fatigue, and diagnosed acute lumbosacral strain. He prescribed Vicodin for low back pain and ice massages and wrote a note indicating that Ms. Purnell could not work for a week.

Dr. Robertson completed a Residual Functional Capacity assessment dated October 19, 2009.  He noted that Ms. Purnell had been diagnosed with rheumatoid arthritis and opined that her prognosis was "fair."  Dr. Robertson indicated that Ms. Purnell had hand and wrist pain, and had "no strength."  He opined that Ms. Purnell was not a malingerer, and that her symptoms

would last at least 12 months.

Dr. Robertson opined that Ms. Purnell's impairments were consistent with the symptoms and functional limitations he described in his evaluation. He opined that, during a typical work day, Ms. Purnell would constantly experience pain or other symptoms severe enough to interfere with the concentration required to perform simple work tasks. Dr. Robertson opined that Ms. Purnell could sit for more than 2 hours at a time, and would need to either sit down or walk around after standing for 5 minutes. He opined that Ms. Purnell could sit for a total of 5 hours and stand/walk for a total of 1 hour during an 8 hour work day, and would need to get up and walk around for 5 minutes every 90 minutes. Dr. Robertson added that Ms. Purnell would need a job that allowed her to change positions from sitting to standing or walking at will, and would sometimes need to take unscheduled work breaks.

Dr. Robertson opined that Ms. Purnell could lift and carry less than 10 pounds frequently and could never lift and carry 10 pounds or more.[1] He indicated that Ms. Purnell had significant limitations in reaching, handling, and fingering, and had virtually no capacity for using her hands for grasping, turning and twisting objects and using her fingers for fine manipulations. Dr. Robertson opined that she would have "good days" and "bad days," but offered no opinion as to how many absences per month would likely result from her impairments and treatments.

### Testimony

### Ms. Purnell

Ms. Purnell testified as follows at the hearing before the ALJ.

Ms. Purnell had last worked as a reader for the Social Security Administration. She had

---

[1]This limitation alone, if accepted, would have limited Ms. Purnell to sedentary work. See 20 C.F.R. § 404.1567 (a) & (b).

left that job in July, 2008 because of arthritis related back pain and a painful hand injury.  Ms.
Purnell had little strength or mobility in her hands.  Her mobility was severely limited, and she
experienced almost constant pain in various parts of her body, including her back, shoulders,
feet, and hands.  Her left index finger was not functional.

Dr. Chamberland wanted to increase Ms. Purnell's levels of medication and prescribe
injectable drugs, but she declined because she did not like needles, and was unwilling to inject
herself.  Prednisone, a steroid that helped control pain "play[ed] havoc" with her stomach.  Ms.
Purnell had not obtained a residual functional capacity assessment from Dr. Chamberland
because "he required that it be filled out by a third-party," and she could not afford to pay.

In response to the ALJ's observation that Dr. Chamberland indicated that she had
discontinued steroid use without consulting him, Ms. Purnell stated that she had talked with Dr.
Chamberland "after the fact," and had stopped taking that medication because she could no
longer tolerate the extreme stomach pain it caused.  Dr. Chamberland had agreed that this was
"fine," and had put her back on a lower dose.

Foot and back pain caused Ms. Purnell  trouble walking, and she was limited in the
cooking, shopping, laundry, and other household chores she could do.  She could not do any
vacuuming and could not clean her floors.  It took her many hours to prepare a family dinner,
and she had difficulty brushing her hair, turning door knobs, and dressing herself.  On "bad"
days, she had to limit her driving and family members needed to help her wash dishes.

Ms. Purnell experienced significant problems with her hands two or three times a week,
and could not manipulate objects, assemble things, or take tops off jars.   She had difficulty
writing with her dominant right hand.

Ms. Purnell was receiving unemployment compensation at the time of the hearing. When she applied for those benefits, she did not think she could work an eight-hour per day job. Though she was not sure she could work part-time, she was willing to try. She understood that, if she received disability benefits, she would probably need to repay unemployment compensation she had been receiving.

Ms. Purnell felt tired all the time and needed to take naps for about half an hour every day. In her most recent job, in addition to reading for the visually impaired, she had been required to create folders, do computer work, file papers, make telephone calls, see clients, obtain information, make copies, and prepare mailings. This job had required her to use both hands constantly.

**Vocational Expert**

The Vocational Expert (VE) testified as follows in response to questioning by the ALJ.

An individual who could perform a full range of light exertional level work could perform Ms. Purnell's past relevant work as an office clerk, customer service worker, and reader. An individual who was limited to only occasional gross manipulation and handling of objects with the right dominant hand could perform none of those jobs as Ms. Purnell had performed them, but would be able to perform the reader job as that work was performed in the national economy. An individual limited to sedentary work likewise could perform none of the past relevant work as performed by Ms. Purnell, but could perform the reader work as it was ordinarily performed in the national economy.

In response to questioning by Ms. Purnell's counsel, the VE testified that she did not have a copy of the "Guide to Specific Characteristics" at the hearing, and would need to do additional research if the handling requirements described in that manual were an issue in

evaluating the jobs under consideration.  The ALJ asked the VE to provide additional information based upon the "Guide to Specific Characteristics" within a few days following the hearing, and told Ms. Purnell's counsel that he would provide him that information and give him an opportunity to submit comments in response.

The VE opined that Ms. Purnell's transferable skills would allow her to perform certain identified sedentary jobs.  She testified that she was not certain whether these jobs  required the capacity to perform more than occasional hand activity bilaterally, and said that she would research that issue.  She testified that use of the hands was very important in sedentary work, and opined that an individual whose pain interfered with concentration and pace as described in Dr. Robertson's RFC would not be able to perform any of the jobs she had identified.

The VE testified that the "Guide to Specific Characteristics" was incorporated into the Dictionary of Occupational Titles (DOT).  She confirmed that she would provide information concerning the handling requirements and exertional levels required  for the positions in question, and the ALJ reiterated that Ms. Purnell's counsel would be provided with the information and given an opportunity to make additional comments.

In an exhibit provided to the ALJ two days after the hearing, the VE indicated that Ms. Purnell's past relevant work as a reader required occasional reaching, handling, and fingering, and that the sedentary clerk position identified at the hearing required occasional reaching and handling, and did not require any fingering.

As noted above, the ALJ did not provide Ms. Purnell's counsel the opportunity to comment on this information until the action was remanded by the Appeals Council.

**ALJ's Decision**

The ALJ found that Ms. Purnell had earned enough coverage to remain insured under Title II of the Social Security Act through December 21, 2012.

At the first step of his disability analysis, the ALJ found that Ms. Purnell had not engaged in substantial gainful activity since the alleged onset of her disability on July 21, 2008.

At the second step, the ALJ found that Ms. Purnell's rheumatoid arthritis and lumbar spine degenerative disc diseases had been "severe" impairments within the meaning of relevant regulations.

At the third step, the ALJ found that Ms. Purnell had not had an impairment or combination of impairments that met or equaled a presumptively disabling impairment set out in the listings, 20 C.F.R. Part 404, Subpart P., App.1.

The ALJ next assessed Ms. Purnell's residual functional capacity (RFC).  He found that she had retained the capacity required to perform light exertional level work, except that she had been limited to occasional handling of objects with her right dominant hand and had needed to avoid frequent exposure to extreme cold and excess vibration.  In reaching this conclusion, he found that Ms. Purnell's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible to the extent they were inconsistent with this assessment.

Based upon the testimony of the VE, at the fourth step, the ALJ found that Ms. Purnell had been able to perform her past relevant work as a reader as that work was generally performed in the national economy.  In reaching this conclusion, the ALJ noted that the VE had submitted a post-hearing statement indicating that, as generally performed, the reader position required only occasional reaching, handling, and fingering.

Having found that Ms. Purnell could perform her past relevant work, the ALJ concluded that she had not been disabled within the meaning of the Act before December 8, 2009.

## Standard of Review

A claimant is disabled if he or she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Claimants bear the initial burden of establishing disability. Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996). The Commissioner bears the burden of developing the record, DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991), and bears the burden of establishing that a claimant can perform "other work" at Step Five of the disability analysis process. Tackett, 180 F.3d at 1098.

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews, 53 F.3d at 1039. The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986). The Commissioner's decision must be upheld, however, even if "the evidence is susceptible to more than one rational interpretation." Andrews, 53 F.3d at 1039-40.

## Discussion

As noted above, Ms. Purnell alleged that she had been disabled since July 21, 2008, and the Agency ultimately concluded that she became disabled as of December 8, 2009. The

question here is whether the ALJ's conclusion that Ms. Purnell was not disabled before

December 8, 2009 was supported by substantial evidence and was free of legal error.

Plaintiff contends that the ALJ erred in failing to credit the opinion of Ms. Purnell's

treating physician, failed to adequately support his conclusion that Ms. Purnell had not been

wholly credible, and failed to accurately assess Ms. Purnell's residual functional capacity.

## 1. **Rejection of Medical Opinion**

## **Evaluating Medical Opinion**

Because treating physicians have a greater opportunity to know and observe their

patients, their opinions are given greater weight than the opinions of other physicians.

Rodriguez v. Bowen, 876 F.2d 759, 761-62 (9th Cir. 1989).  An ALJ must provide clear and

convincing reasons for rejecting a treating physician's uncontroverted opinions,  Lester v. Chater,

81 F.2d 821, 830-31 (9th Cir. 1995), and must provide "specific, legitimate reasons . . . based

upon substantial evidence in the record" for rejecting opinions of a treating physician which are

contradicted.  Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989) (citations omitted).

## **Analysis**

In an RFC evaluation dated October 19, 2009, Dr. Robertson, Ms. Purnell's treating

physician, assessed Ms. Purnell with limitations that would have precluded competitive

employment.  The ALJ gave "very limited weight" to Dr. Robertson's opinion because he had

not seen Ms. Purnell since July, 2008, and because Ms. Purnell "stated that she only sought his

opinion because her rheumatologist refused to cooperate."  The ALJ gave "significant weight" to

the opinions of non-examining state Agency doctors.  He noted that a non-examining doctor had

observed that Ms. Purnell had a "history of noncompliance with medication," and had opined

that "her self-reported limitations . . . were unsupported by examinations showing normal range

of motion and strength."  The ALJ asserted that the opinions of the non-examining doctors were "well supported by medically acceptable clinical and laboratory diagnostic techniques . . . ."  He asserted that Ms. Purnell herself had "stated numerous times that she uses a computer quite a bit" and had told her doctors that she had no difficulty dressing herself or turning door knobs, except as he had noted earlier in the decision.

The ALJ stated that  he "afforded weight" to Dr. Chamberland's "assessment findings and notes" because of his expertise.

Dr. Robertson's opinion as to the severity of Ms. Purnell's impairments was not contradicted by the opinions of any treating or examining physician that appear in the medical record, and the opinions of the non-examining Agency doctors do not constitute "substantial evidence" that supports rejection of Dr. Robertson's opinion.  See Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995) (opinion of non-examining physician does not constitute "substantial evidence" supporting rejection of treating physician's opinion).  Under these circumstances, the ALJ was required to provide clear and convincing reasons for rejecting Dr. Robertson's opinions.

The ALJ's reasons here did not meet that standard.  Though Dr. Robertson may not have seen Ms. Purnell for more than a year when he prepared her RFC assessment, there is no basis for concluding that he lacked an objective basis for his opinion or for concluding that Plaintiff's condition had improved since he had last seen her.   The medical record confirms that Dr. Robertson had examined Ms. Purnell numerous times, had referred her to Dr. Chamberland for specialized care, and had received and reviewed Dr. Chamberland's detailed records of her treatment for rheumatoid arthritis.  The medical record establishes that rheumatoid arthritis was a severe medical problem, and that it is a progressive disease whose debilitating effects were

unlikely to diminish between the time Dr. Robertson last saw Ms. Purnell and the date of his RFC assessment.

The ALJ's assertion that Ms. Purnell sought an RFC assessment from Dr. Robertson only because Dr. Chamberland "refused to cooperate" is inaccurate and irrelevant. In determining whether the ALJ adequately supported his rejection of Dr. Robertson's opinion, the question is not why the medical record does not include an RFC evaluation from Dr. Chamberland, but whether Dr. Robertson's own opinion was objective, based on an adequate knowledge of Ms. Purnell's condition, and was consistent with objective medical evidence. The medical record supports only the conclusion that Dr. Robertson understood Ms. Purnell's medical condition based upon a substantial treatment history and review of Dr. Chamberland's records, that he based his opinions as to her limitations on objective medical evidence, and that his assessment was consistent with substantial evidence in the medical record.

In addition, Ms. Purnell did not testify that Dr. Chamberland "refused to cooperate." Instead, she asserted that he had wanted to send her to a "third party" for an evaluation and that she could not afford this additional expense. At the hearing, Ms. Purnell's counsel suggested that Dr. Chamberland might complete an RFC evaluation if the ALJ asked him to do so. Having failed to follow up on this suggestion, the ALJ could not fairly imply that Dr. Robertson's evaluation merited little weight because Ms. Purnell's treating rheumatologist should have prepared an RFC assessment.

The ALJ's assertions that Ms. Purnell had told doctors that she had no difficulty dressing and turning knobs, and that examinations showed normal range of motion and strength do not fairly describe the medical record. The record shows that, though Ms. Purnell initially reported that she could dress and turn knobs, as her arthritis progressed, she consistently described

OPINION AND ORDER - 17

increasing problems with such activities.  In addition, Dr. Chamberland's treatment notes indicated that Ms. Purnell had reduced strength and range of motion in her hands and wrists, and Dr. Chamberland appeared to fully credit Ms. Purnell's description of her pain and limitations. His notes and findings, which the ALJ "afforded weight," were fully consistent with Dr. Robertson's assessment of Ms. Purnell's impairments.

Where, as here, an ALJ fails to provide adequate reasons for rejecting the opinion of a treating physician, the opinion is credited as a matter law.  Lester, 81 F.3d at 834.  Remand for an award of benefits is then appropriate if the record is fully developed, and it is clear that a finding of disability would be required if the improperly rejected evidence were accepted. Smolen v. Chater, 80 F.3d 1273, 1292 (9th Cir. 1996).  Here, remand for an award of benefits is appropriate because the record is fully developed and a finding of disability is required if Dr. Robertson's opinion is accepted.  In the absence of adequate reasons for rejecting that opinion, the ALJ's conclusion that Plaintiff could perform her past relevant work, upon which a finding of non-disability depended, lacked substantial support.

## 2. **Ms. Purnell's Credibility**

Where, as here, a claimant produces medical evidence of an underlying impairment that is reasonably expected to produce some degree of the symptoms alleged and there is no affirmative evidence of malingering, an ALJ must provide "clear and convincing reasons" for an adverse credibility determination.  Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir. 1996); Gregor v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006).

As noted above, the ALJ found that Ms. Purnell's  statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible to the extent they were inconsistent with his RFC assessment.  He did not explicitly cite any basis for this finding.  He

OPINION AND ORDER - 18

implied, however, that Ms. Purnell's credibility was undermined by changes in her description of the severity of her limitations over time. In addition, his citation to a non-examining agency doctor's observation that Ms. Purnell had a "history of noncompliance with medication" and his observation that she had repeatedly stated that she used a computer "quite a bit" may have been intended to support the credibility determination.

If these were the bases of the ALJ's credibility determination, they are not "clear and convincing" reasons that support the conclusion that Ms. Purnell was not wholly credible. Ms. Purnell's descriptions of increasing difficulty carrying out activities of daily living over time were fully consistent with evidence that her strength and range of motion decreased, and her level of pain increased, as her rheumatoid arthritis worsened. The notes of Ms. Purnell's treating physicians included clinical observations that documented a worsening of Ms. Purnell's impairments and limitations, and Dr. Chamberland, Ms. Purnell's treating rheumatologist, repeatedly warned that her arthritis could worsen, resulting in further joint deterioration, over time.

Treatment notes do indicate that Ms. Purnell once stopped taking prescribed prednisone without first consulting Dr. Chamberland. Dr. Chamberland noted that he had "[t]old patient if manipulating medications to call me," but did not explicitly state that Ms. Purnell was "noncompliant." Dr. Chamberland noted that Ms. Purnell had discontinued prednisone because it caused her stomach problems, and he did not immediately put her back on that medication. His treating notes indicate that he discussed a number of treatment options with Ms. Purnell, and noted which options she had chosen. The notes do not indicate that Ms. Purnell refused to follow any course of treatment that Dr. Chamberland prescribed.

The Commissioner correctly notes that a claimant's statements may be considered "less credible if . . . the medical reports or records show that the individual is not following the treatment as prescribed and there is no good reason for this failure."  SSR 96-7p at *7.  Here, Ms. Purnell's decision to discontinue prednisone before she consulted a treating physician cannot be fairly characterized as a failure to follow "the treatment as prescribed" within the meaning of this regulation.  Even if it could be, the record supports only the conclusion that Ms. Purnell had "good reason" not to take the drug:  Dr. Chamberland noted that prednisone had caused Ms. Purnell stomach problems.  Under these circumstances, Ms. Purnell's decision to stop taking one of the many medications prescribed by her treating physicians is not a clear and convincing reason for discounting her credibility.

Finally, the ALJ's observation that Ms. Purnell had reported using a computer "quite a bit" is not clear and convincing evidence that Ms. Purnell was not wholly credible.  There is no indication as to the amount of computer use deemed to constitute "quite a bit," and there is no evidence that Ms. Purnell could use a computer in a manner that would allow her to sustain competitive employment.  There is no evidence that Ms. Purnell's use of a computer was inconsistent with Dr. Robertson's conclusion that she could not complete a normal work day, could not concentrate sufficiently to reliably complete simple tasks, and was severely limited in her ability to use her hands.

As noted above, this action should be remanded for an award of benefits based upon the ALJ's failure to properly credit the opinions of Ms. Purnell's treating physician.  The lack of adequate support for the adverse credibility finding is an additional reason to remand this action for an award of benefits.  See, e.g., Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995) (remand for

award of benefits appropriate if claimant's improperly rejected testimony would establish disability if accepted).

3. **Adequacy of ALJ's Vocational Hypothetical**

In order to be accurate, an ALJ's vocational hypothetical presented to a VE must set out all of a claimant's impairments and limitations.  E.g., Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984).  The ALJ's depiction of a claimant's limitations must be "accurate, detailed, and supported by the medical record."   Tackett v. Apfel, 180 F.3d 1094, 1101 (9th Cir. 1999).  If the assumptions set out in the hypothetical are not supported by the record, a VE's conclusion that a claimant can work does not have evidentiary value.  Gallant, 753 F.3d at 1456.

Plaintiff contends that the VE's testimony that Ms. Purnell could perform her past relevant work as a reader did not support the conclusion that Ms. Purnell was not disabled because it was based on a vocational hypothetical that did not include all of Ms. Purnell's limitations.  I agree.  The ALJ posed a vocational hypothetical describing an individual who could perform light work, subject only to the ability to only occasionally handle objects with the right dominant hand.  "Occasionally" means up to one-third of the time.  SSR 83-10.  As noted above, the ALJ provided inadequate reasons for rejecting Dr. Robertson's opinion that Ms. Purnell lacked the residual functional capacity required to perform full time work, and was significantly limited in her ability to handle objects.  Because these limitations were not included in the ALJ's vocational hypothetical, the VE's testimony that Ms. Purnell could perform her past work as a reader lacked evidentiary value.

**<u>Conclusion</u>**

This action is remanded to the Agency for a finding that Ms. Purnell was disabled from July 21, 2008 to December 8, 2009, and for an award of benefits for that period.

DATED this 20th day of February, 2013.


     /s/ John Jelderks
John Jelderks
U.S. Magistrate Judge